949 So.2d 1108 (2007)
Marilyn R. SELL, Appellant,
v.
Louis F. SELL, Appellee.
No. 3D-06-994.
District Court of Appeal of Florida, Third District.
February 14, 2007.
Rudolph & Leacock and Howard Rudolph and David Leacock, West Palm Beach; Sheri Smallwood, Key West, for appellant.
*1109 Louis F. Sell, Lake Placid, in proper person.
Before WELLS, and CORTIÑAS, JJ., and SCHWARTZ, Senior Judge.
WELLS, Judge.
Former-wife, Marilyn R. Sell, appeals from a post-decretal order denying payment of attorneys' fees from the proceeds of the sale of the marital home. We agree with the former-wife that all of the awards made to her, including those for attorneys' fees and costs, should be paid from these proceeds and reverse for entry of such an award.
The parties were married on December 31, 1995, after living together for almost fifteen years. At the time of the marriage, the former-husband, a 62 year old retired dentist, owned a parcel of real property located in the Florida Keys, on which the former-husband had built a home in which the parties lived. The former-husband also had cash and securities in his name alone valued at over $400,000. The former-wife, a former schoolteacher, was 52 years old at the time of the marriage and had approximately $20,000 in assets. Although neither party was employed during their long relationship, the former-husband received $2,200 per month and an additional $38,000 lump sum payment a year as the sole beneficiary of the Milton Sell Trust.
On the day the parties were married, they executed a pre-nuptial agreement prepared, without the benefit of counsel, by the former-husband. That agreement provided that in the event of a divorce, the former wife would receive $50,000 and one half of any net savings accumulated during the marriage from earned income.
In mid-1996, the former-husband was diagnosed with prostate cancer. A little over a year later, he added the former-wife's name to several accounts previously held in his name alone. He also deeded the home in which the parties lived to himself and the former-wife.
In August 2001, the former-wife left the marital home taking approximately $19,500 in jointly owned funds with her and filed for a divorce. The former-husband transferred the remainder of the funds then in joint accounts, approximately $377,000, to accounts in his name alone.
On December 15, 2003, after what the trial court described as "heated litigation" by the parties, a final judgment of dissolution of marriage was entered. That judgment confirmed the validity of the pre-nuptial agreement and also concluded that the former-husband intended to gift an interest in the marital home to the former-wife when he added her name to the title of that property. The parties were ordered to sell this asset.
On February 6, 2004, the final judgment was clarified[1] to expressly confirm that in addition to one half of the proceeds from the sale of the marital home, the former-wife was entitled to one-half of:
 a $100,000 certificate of deposit which the husband had gifted to the former-wife during the marriage;
 a $277,000 treasury direct account which the husband had gifted to the former-wife during the marriage; and
 $39,000 that the parties divided at separation.
The former-husband was ordered to pay these amounts, less a small set-off to reimburse him for a portion of the funds taken by the former-wife when she left the marital home, "forthwith and without further delay." He was also ordered to pay a $12,000 temporary alimony arrearage (with interest thereon) at the rate of $1200 *1110 per month and $50,000 in attorneys' fees, the latter to be paid from the former-husband's "share of the monies and property equitably distributed to him."
Other than paying the former-wife $50,000 as required by the pre-nuptial agreement, the former-husband complied with no portion of this judgment. Insisting that he was obligated to pay the former-wife only the $50,000 required by the pre-nuptial agreement that he had drafted, he used all of the cash assets in the marital estate on himself and his attorneys and undertook a course of conduct guaranteed to impoverish the former-wife and render the final judgment meaningless.
He appealed from the final judgment and then repeatedly refused to comply with orders obligating him to pay temporary support and appellate attorneys' fees to the former-wife.[2] The trial court, finding that former-husband had more than $79,000 in cash and an additional $38,000 in the Milton Sell Trust, which he, as sole trustee, could disburse to himself, concluded that the former-husband had acted in "bad faith," choosing to "use every subterfuge and device to attempt to evade his obligations . . . to the prejudice of the Former Wife." He was found "in willful, contumacious and voluntary contempt" and incarcerated. He immediately filed a petition for writ of habeas corpus in this court seeking release. The petition was denied.
The former-husband then filed an emergency motion for release from jail in the trial court claiming that he had no dental floss, that he was receiving generic rather than name brand drugs, and that he was seriously ill and receiving inadequate medical care. That motion was also denied with the trial court recognizing that it was an unfounded waste of money:
1. . . . I find [the former-husband's] motion to be without merit and unsupported by any reasonable view of the evidence. Moreover, it presents no genuine emergency.
2. This Court has previously found that the Husband has the ability to comply with the Orders entered herein. . . . The Court confirms its earlier conclusion that the Husband has the keys to the jail in his pocket. . . .
3. The Husband's complaints regarding the treatment he is allegedly receiving or not receiving at the jail, and the impact he contends is being caused to him by the same, are not borne out by the evidence and testimony. By his own admission, however reluctantly and begrudgingly made, the jail's medical personnel are attending to his medical needs. He has been and is being seen by the institution's doctor and medical staff as necessary. He is being given medicines which the doctor has determined are appropriate and adequate for any conditions he may have. His blood pressure is being monitored. He is provided with hygienic items.
* * * *
8. Whatever sums the Husband expended in support of his so-called Emergency Motion were totally unnecessary and, in the Court's view, wasted. Nevertheless, the Wife was forced to respond to his Motion and necessarily incurred attorney's fees and costs in doing so. The Husband should and will be held responsible for the consequences of his actions.
*1111 On April 16, 2004, the former-wife advised the trial court that she had no money and no assets with which to support herself or to continue the never ending legal battle. Because the former-husband had refused to cooperate in any manner in listing the marital home for sale or in providing access to appraisers or prospective purchasers, she asked the court to transfer the home to her so that it could be sold. This motion and another motion seeking to hold the former-husband in contempt were set for hearing on July 21, 2004. The former-wife and her attorneys appeared, at substantial expense, for this hearing. The former-husband did not. Instead, he sent facsimile notification of a bankruptcy proceeding which he had initiated, pro se, four days earlier, in which he sought to nullify the awards made to the former-wife. All state court proceedings were stayed.
Long without funds or assets that could be used for support or to pay attorneys fees, the former-wife petitioned for and obtained relief from the bankruptcy stay so that she could obtain a state court order authorizing sale of the marital home.[3] However, at this point, for the first time, the former husband asserted that the home could not be sold as it was his homestead. The court below adopted that position and refused to order sale of the home finding such action barred by Article X, section 4 of the Florida Constitution. This court vacated that part of the trial court's order prohibiting the sale of the home.
The home was not, however, sold as ordered because, as was his habit, the former-husband refused to cooperate. He refused to allow access to appraisers, real estate agents, or potential purchasers, and had to be ordered to vacate the premises. He did not, of course, vacate but instead had to be forcibly removed by a SWAT team following a five hour stand-off. He further hindered the sale by refusing to respond to correspondence and telephone calls and by making himself scarce; he refused to execute documents necessary to close the sale. A commissioner had to be appointed to execute the closing documents in his stead.
The trial court found the former-husband in "willful violation" of its orders directing the sale of the marital residence and concluded that the former-husband had "increased costs, fees, and expenses to the Former Wife . . . without good or valid reason." As a consequence, the court below reserved jurisdiction to award fees and costs to the former-wife from "any property, funds, or assets belonging to him, including but not limited to his share of the sale proceeds [from the marital home]."
In late-summer of 2005, the bankruptcy court rejected the former-husband's attempt to discharge the awards made to the former-wife in the final judgment of dissolution of marriage. The bankruptcy stay was lifted and the final judgment of dissolution of marriage was affirmed by this court. By this time, the former-husband had spent all of the funds in the two accounts that were to be equitably distributed in equal shares between the parties and which on February 6, 2004, he had been ordered to pay to her "forthwith." Consequently, the former-wife sought an equitable lien against the former-husband's share of the funds from sale of the marital home to secure payment of the balance of her distribution award. She also sought an equitable lien against these funds to secure payment of alimony arrearages and attorneys' fees. Although the trial court ordered the equitable distribution *1112 and alimony awards to be paid from this fund, it refused to order payment of her fees, finding this fund exempt under Article X, section 4 of the Florida Constitution.
We agree for a number of reasons that the former-wife attorneys' fees should have been paid from this fund. First, the final judgment of dissolution of marriage expressly provides for the payment of the former-wife's fees and costs from the assets being distributed, including the proceeds from the sale of the marital home. That judgment and this provision have already been approved by this court and are binding on the court below.
Second, we agree with the Fourth District Court of Appeal's statement that because "marital property was designated as homestead before the divorce does not bar imposition of a lien on marital property distributed to one of the partners any more than the previous homestead character bars the distribution itself or partition or sale." Partridge v. Partridge, 912 So.2d 649, 650 (Fla. 4th DCA 2005).
Third, the exemption enshrined in Article X, section 4 is not absolute in this context. Homestead property may be subjected to equitable liens where fraud, reprehensible or egregious conduct is demonstrated:
The constitutional exemption on homestead property is not absolute. As such, the homestead can be the subject of an equitable lien and foreclosure by a forced sale in an appropriate case. The Florida Supreme Court stated in Palm Beach Savings & Loan Ass'n v. Fishbein, 619 So.2d 267, 270 (Fla.1993), "that where equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of article X, section 4." The first district echoed our supreme court when it stated:
Despite the exemption of homestead property from forced sale as provided in Art. X, § 4(a)(1), the trial court correctly concluded that an equitable lien can be imposed against such property under certain circumstances, namely, where a plaintiff can establish fraud or "reprehensible conduct" on the part of the beneficiary of the constitutional protection.

Partridge v. Partridge, 790 So.2d 1280, 1283 (Fla. 4th DCA 2001) (quoting Isaacson v. Isaacson, 504 So.2d 1309, 1310 (Fla. 1st DCA 1987) (emphasis added in Partridge)).
In Gepfrich v. Gepfrich, 582 So.2d 743 (Fla. 4th DCA 1991), the court approved forced sale of homestead property where the former-husband attempted to use the homestead exemption to defraud the former-wife and escape a debt to her. As the court explained:
`[t]he Courts have taken the view that inasmuch as the purpose of the exemption statute is to protect not only the husband but also his family from destitution and becoming a public charge, the exemption statute will not, unless the contrary intention is clearly shown, be construed to enable the husband to claim its benefits against the very persons to whom he owes the obligation of support and maintenance, and that to construe the statute otherwise would, at least in part, defeat its avowed object'.
Gepfrich, 582 So.2d at 744 (quoting Anderson v. Anderson, 44 So.2d 652 (Fla. 1950)).
This court addressed these same points in Robles v. Robles, 860 So.2d 1014, 1015-1016 (Fla. 3d DCA 2003):
It is a constitutional given that homestead property may not ordinarily be subjected to the imposition of a lien of *1113 this kind. See Article X, Section 4, Florida Constitution ("There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, . . . the following property owned by a natural person: (1) a homestead . . . ."). This is true even as to unpaid alimony unless, as in such cases as Radin v. Radin, 593 So.2d 1231 (Fla. 3d DCA 1992), review denied, 605 So.2d 1265 (Fla.1992) and Gepfrich v. Gepfrich, 582 So.2d 743 (Fla. 4th DCA 1991), the payor is shown to have been guilty of affirmative fraudulent or reprehensible conduct which improperly interfered with the spouse's ability to recover the award. See Pegram v. Pegram, 821 So.2d 1264 (Fla. 2d DCA 2002); Dyer v. Beverly & Tittle, P.A., 777 So.2d 1055 (Fla. 4th DCA 2001), review denied, 796 So.2d 536 (Fla.2001); Partridge v. Partridge, 790 So.2d 1280 (Fla. 4th DCA 2001); Smith v. Smith, 761 So.2d 370 (Fla. 5th DCA 2000). See also Callava v. Feinberg, 864 So.2d 429 (Fla. 3d DCA 2003)(no lien on wife's homestead for attorney's fees owed her own lawyer).
Robles, 860 So.2d at 1015-1016.
As the Fourth District recently confirmed, contemptuous conduct may "be the functional equivalent of fraud," representing "the kind of reprehensible conduct" that will justify imposition of a lien on homestead property. See Partridge, 912 So.2d at 650.
In the instant case, the record clearly documents that the fees at issue were incurred as a direct result of the former-husband's reprehensible, egregious and consistently contemptuous conduct in attempting to nullify the trial court's property distribution, support, and fee awards. From the outset, his purpose has been to deplete the marital estate so that the former-wife receives only the $50,000 that he intended that she receive in the pre-nuptial agreement that he drafted. To further this end, he has ignored repeated orders to pay the former-wife forthwith and has utilized the funds that were to be paid to her as equitable distribution to finance his share of the legal battle thereby making her award meaningless. He has obstructed, hindered and delayed every action ordered by the court below. He has been jailed for contempt; he filed a baseless bankruptcy proceeding; he had to be removed from the marital home by a SWAT team; and a commissioner had to be appointed to consummate a court ordered sale. Throughout this all, he has been able to pay his attorneys and expenses. The former-wife is now substantially indebted to a number of attorneys for defending this onslaught. Failure to impose a lien on a portion of the former-husband's share of the proceeds from the sale of the marital home will simply accomplish the goal the former-husband has undertaken, which is to render the former-wife's equitable distribution meaningless. This is precisely the kind of "the kind of reprehensible conduct" that justifies imposition of a lien on homestead property, if indeed such an exemption exists.
Accordingly that portion of the order under review that denies imposition of a lien on the former-husband's share of the proceeds from the sale of the marital residence is reversed and the case is remanded for entry of an order authorizing payment of all of the former-wife's outstanding attorneys' fees from that fund.
NOTES
[1] This clarification apparently was not reduced to writing until April 14, 2004.
[2] The order awarding appellate attorneys' fees to the former wife confirmed that the former husband had "paid his attorneys at least $232,555.00 ... on a current and continuing basis" and that all of his attorneys had been paid in full. By contrast, the former-wife had incurred approximately $200,000 in fees, $125,000 of which had remained unpaid for over a year.
[3] All of the former-husband's attorneys had been fully reimbursed for their services when he petitioned for bankruptcy. Indeed, some had been paid in advance for their services.